IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>VICTOR MANUEL REZA-RAMOS,<br><br>    Defendant. | CR 06-1142-TUC-FRZ (GEE)<br><br>**REPORT AND RECOMMENDATION** |

        The District Court referred this case to the magistrate for hearing on pretrial matters. Hearing on the defendant's pretrial motions, including a Motion to Suppress, was held on September 18, 2008. Upon consideration of the evidence presented and the arguments of respective counsel, the magistrate recommends the District Court, after its de novo review, deny the defendant's Motion to Suppress and Motion for *Henthorn* material on non-federal officers.

**CHARGE:**

        The indictment charges that on March 25, 2003, on the Tohono O'Odham Indian Reservation, the defendant, with premeditation and malice aforethought, killed Jose L. Flores, by beating him to death, in violation of 18 U.S.C. §§111, 1151, and 1152.

**MOTION TO SUPPRESS STATEMENT:**

Defense counsel asks this court to suppress a statement made by the defendant on the grounds that it was "obtained in violation of *Miranda, Massiah,* and the due process requirement of voluntariness."

*Testimony of Bienvenido Perez-Martinez*

Perez-Martinez is a FBI Special Agent. On March 26, 2008, he was working in the downtown FBI office in Tucson. He became involved in the present case when Agent Jason Van Goor asked him to assist in processing and interviewing Reza-Ramos who had arrived in Tucson after being extradited from Mexico. Van Goor needed the assistance of a Spanish speaker, and Perez-Martinez testified he is a native Spanish speaker. About 10:30 a.m. Perez-Martinez and Van Goor entered a room where Reza-Ramos and another agent, Scott Hunter, were present. Perez-Martinez introduced himself as a FBI agent, asked the defendant about his well-being, explained he was charged with murder, and stated they were going to process him. At that point the defendant stated "he was at the ranch and saw the victim." Perez-Martinez testified he immediately told the defendant to stop and explained that if he wanted to make a statement he would have to first be Mirandized. Perez-Martinez stated he then read the defendant his *Miranda* rights. When Perez-Martinez then asked the defendant if he wanted an attorney he responded in the affirmative and added that Mexican authorities had told him to ask for an attorney. Perez-Martinez testified he then advised Reza-Ramos the court would appoint an attorney to represent him when he appeared in court that afternoon, and he should tell the attorney of his desire to cooperate with the agents so they could then sit down and talk together.

Perez-Martinez described the interview room as measuring "15 by 15" with no windows. The room contained a desk, a computer, a camera, and several chairs. The defendant was sitting in a chair and Perez-Martinez and Van Goor each sat in chairs. Perez-

1  Martinez testified agent Hunter does not speak Spanish. Perez-Martinez did not know how
2  long Peza-Ramos had been in the room before he and Van Goor entered.

3  Perez-Martinez testified that after Reza-Ramos stated he wanted an attorney, he
4  completed processing the defendant, i.e., gathering biographical information, fingerprinting,
5  photographing. This took about five minutes. Perez -Martinez then left the room and had
6  no further contact with the defendant.

7  On cross-examination, Perez-Martinez testified that on March 26, 2008, he was
8  not only a supervisory FBI agent, but also a Border Liaison Officer to Mexico.  As
9  theLiaison Officer his job was to assist in returning U.S. citizens to this country who were
10 fugitives from the U.S. and were being deported from Mexico. He said he was aware of
11 the process of extraditing Mexican citizens who were charged with U. S. federal crimes, but
12 he was not involved in the extradition process.  To his knowledge, extradition is sought by
13 the U. S. Department of Justice and the person sought may sit in a Mexican jail for some
14 time before the process is completed. He assumes that the extradition papers prepared by
15 the Justice Department includes a statement of the criminal charge against the Mexican
16 national.

17 Perez-Martinez stated that at some previous time Van Goor had asked him about
18 the process necessary to get a Mexican national returned to the U.S. in order to face criminal
19 prosecution. He advised Van Goor that procedure was beyond his jurisdiction as a Border
20 Liaison Officer and that extradition was handled through the U.S. Attorney's office and the
21 Department of Justice.

22 Perez-Martinez estimated that an airline flight from Mexico City to Phoenix
23 takes about eight hours.

24 Perez-Martinez admitted he wrote a report on March 26, 2008, following his
25 contact with the defendant. (Attached hereto as Exhibit A.) Asked about the statement in
26 that report that he was to "assist with in-processing and conduct an interview", Perez-
27
28

1  Martinez testified that he meant he was to assist with in-processing and to assist with the
2  interview.
3        Perez-Martinez was aware the defendant was scheduled to appear in federal
4  court on the afternoon of March 26th and that a lawyer would be appointed to represent him
5  at that time; in fact, he so advised the defendant that morning during his contact with him.
6        Asked why he would have advised the defendant that he was from Puerto Rico
7  Perez-Martinez stated the defendant may have asked where he was from. Perez-Martinez
8  stated he has a rather unique Spanish accent and Mexican Spanish speakers often ask about
9  it. Perez-Martinez denied telling the defendant that he was there to help him.
10       Perez-Martinez stated he asked the defendant if he was "fine" and Reza-Ramos
11 indicated he was "okay." Perez-Martinez also clarified that when his report indicates the
12 defendant stated "He was at the ranch and saw the victim" (*see* Exhibits A and B attached
13 hereto), that was a "paraphrase" of the defendant's statement–the defendant actually used
14 the pronoun "I".
15       Perez-Martinez denied asking the defendant why he wanted a lawyer if he
16 wanted to talk to the agents. He admitted asking the defendant who had told him to ask for
17 a lawyer, and the defendant said he was told in Mexico that he needed to have a lawyer.
18 Perez-Martinez stated he get a lawyer that afternoon. Perez-Martinez stated the defendant
19 indicated several times he was willing to speak with the agents, but also indicated he wanted
20 a lawyer after he was Mirandized. Therefore, Perez-Martinez suspended any further
21 questioning of the defendant other than that meant to collect biographical data.
22
23 **Testimony of Jason Van Goor**
24       Van Goor is employed by the FBI and is the case agent for this case. He was
25 called as a defense witness.
26       Van Goor stated he presented this case to the grand jury that indicted Reza-
27
28

Ramos on June 21, 2006. He himself was unfamiliar with the process for getting the defendant returned to the U.S. and therefore he approached Perez-Martinez who, in turn, referred him to the U.S. Attorney's office. Perez-Martinez had no further involvement in the case until he was asked to assist in processing and interviewing the defendant in March, 2008.

Reza-Ramos was in custody in Mexico for about eight months before he arrived in Phoenix on March 25, 2008, along with two FBI agents who had accompanied him on the flight from Mexico City. Van Goor did not know if either of those two agents had advised the defendant of the charge against him or had advised him of his *Miranda* rights. Van Goor estimated he met the defendant's plane in Phoenix about 9 or 10 on the evening of March 25, 2008, and dropped him off at the FCI in Tucson around midnight. He did not know how long before the defendant was placed in a cell there. Van Goor estimated he picked the defendant up from FCI around 8:30 or 9 the morning of March 26th. He was unaware of the time the defendant had been awakened on March 26th or whether he ate breakfast. There are vending machines at the FBI facility where he took the defendant, and if detainees ask for something to eat or drink Van Goor stated he will usually accommodate those requests. Because Perez-Martinez was speaking to the defendant in Spanish Van Goor did not know if he requested food or drink, and he did not recall if he was given water.

Van Goor testified he had given Perez-Martinez very little information about the case: only that it involved a homicide on the reservation and the defendant had been extradited from Mexico.

Van Goor was present during the entirety of Perez-Martinez's contact with Reza-Ramos–about five to ten minutes. Although he could not recall if he instructed Perez-Martinez to ask about the defendant's well being, he stated, "It's fairly standard practice among our agents to make sure the people we bring into or office have food, have drink, and if they have any medical issues, we take care of...."

**MOTION FOR BILL OF PARTICULARS:**

At the hearing the defense argued it was entitled to know if the government's charge was based on a felony-murder theory. The court asked for further briefing on the issue, and in its response to defendant's supplemental brief, the government wrote, "The government at this time is only proceeding on a first degree murder charge and *not* on felony murder." (Emphasis added.)

**MOTION FOR HENTHORN MATERIALS ON NON-FEDERAL AGENTS:**

At the hearing the government agreed to request and produce *Henthorn* material on federal agents, but objected to the defense request for *Henthorn* material on tribal and state law enforcement officers who worked closely with federal agents in developing this prosecution. This court requested supplemental briefing on this issue.

The defense notes that when it sought to subpoena the records of the Tohono O'Odham Police Department relating to this case, the government opposed the subpoena on the grounds the records were protected by federal statute because the tribal officers were acting pursuant to federal statute and, in fact, "approximately twenty five percent of TOPD officers are cross-deputized with the United States." The defense concludes the government is taking a inconsistent or contradictory position when it now argues that tribal police are not federal officers within the purview of *Henthorn*.

The defense cites no persuasive authority in support of its position, and this court is loathe to expand the scope of *Henthorn*. First, because the disclosure of non-federal law enforcement officer's personnel file is intrusive. Second, because the defendant's suggestion that *Henthorn* should apply to those non-federal officers who work "closely" with federal agents is not easily quantified, e.g., should it depend on the amount of time the non-federal officer spent on the federal case or on the significance or materiality of the non-federal officer's contribution.

## DISCUSSION:

### *Motion to Suppress*

The parties agree the defendant made his challenged statement, i.e. that he was at the ranch and saw the victim, while he was in the custody of the FBI. Therefore, if the agents engaged in custodial interrogation or questioning of the defendant, they were first required to advise him of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966).

The defense, apparently conceding there was no direct questioning of the defendant, cites *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980), for the proposition that interrogation "refers not only to express, but also to any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have know that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302, n.8. The defense argues Perez-Martinez's advising the defendant that he was charged with murder was intended to elicit an incriminating statement by Reza-Ramos. Counsel argues there was no reason to have advised the defendant he was charged with murder because Perez-Martinez should have known that Reza-Ramos would have already been advised of the charge while he was incarcerated in Mexico during the lengthy extradition process. Thus, the defense position is that Perez-Martinez's merely advising the defendant that he was charged with murder was calculated to elicit an incriminating statement from him. However, no case is offered to support this very broad conclusion. Nor is there any evidence that Perez-Martinez made any reference to the victim's name or manner of death, the location of the alleged crime, or any statement or comment that could reasonably be interpreted as designed to stir or provoke a sense of guilty concern, unlike the objectionable statements in *Rhode Island v. Innis*. Accepting the defendant's argument would preclude law enforcement officers from advising an arrestee of the crime of which he was

suspected–at least until it was established whether he had previously been notified of the suspected crime.  And attempting to establish that knowledge might well entail more conversation with the suspect that might violate the tenets of *Miranda*.  This court further notes that no circumstances (e.g., the length of the plane trip from Mexico City, Perez-Martinez telling the defendant he was from Puerto Rico, Perez-Martinez asking about the defendant's well-being, how much sleep or sustenance the defendant had received at FCI) leading up to or surrounding the defendant's appearance at the FBI office on March 26th, either singly or accumulatively, suggests the FBI set out to either weaken or overbear his will, or to take advantage of his condition.

This court agrees with the government's argument that the defendant's statement was not the result of direct or indirect interrogation of the defendant, but, rather, was voluntary and spontaneous.

**RECOMMENDATION**:

In view of the foregoing, the magistrate recommends that the District Court, after its de novo review of the record, **DENY** the defendant's Motion to Suppress and Motion for *Henthorn* material of non-federal law enforcement officers.  Any party may file objections within 10 day after being served with a copy of this Report and Recommendation.  If objections are not timely filed, the party's right to de novo review may be waived.  If objections are filed, the parties should direct them to the District Court by **omitting the magistrate's initials from the caption.**

This Report and Recommendation is being faxed to all counsel on today's date.  The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 24th day of November, 2008.

*/s/ Glenda E. Edmonds*
Glenda E. Edmonds
United States Magistrate Judge